217 F.3d 93 (2nd Cir. 2000)
 THE STATE OF CONNECTICUT, on the relation of Richard Blumenthal in his capacity as Attorney General of the State of Connecticut, Plaintiff-Appellant,
v.
JOHN P. CAHILL, as New York State Commissioner of Environmental Conservation and DONALD W. BREWER, as Director of the Division of Law Enforcement at the New York State Department of Environmental Protection, Defendants-Appellees.
FISHERS ISLAND LOBSTERMEN'S ASSOCIATION, INC. and FISHERS ISLAND CONSERVANCY, INC., Amici Curiae,
VIVIAN I. VOLOVAR, Movant.
 Docket No. 99-7793
August Term 1999
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: January 11, 2000
Decided: July 07, 2000
 
 Appeal from the June 3, 1999, judgment of the United States District Court for the Northern District of New York (Frederick J. Scullin, Jr., Judge), dismissing a suit by Connecticut against officers of New York State on the ground that the suit is within the original and exclusive jurisdiction of the Supreme Court.
 Vacated and remanded.[Copyrighted Material Omitted]
 Mark P. Kindall, Asst. Atty. General, Hartford, Conn. (Richard Blumenthal, Conn. State Atty. General, Hartford, Conn., on the brief), for plaintiff-appellant.
 Peter Lehner, Asst. Atty. General, New York, N.Y. (Eliot Spitzer, N.Y. State Atty. General, Edward Johnson, Deputy Solicitor General, Michael Belohlavek, Asst. Solicitor General, Gordon J. Johnson, Gregory J. Nolan, Asst. Attys. General, New York, N.Y., on the brief), for defendants-appellees.
 Steven S. Michaels (Sarah R. Cebik, Debevoise & Plimpton, New York, N.Y., on the brief), for amici curiae Fishers Island Lobstermen's Assn., Inc. and Fishers Island Conservancy Inc.
 Before: NEWMAN, WALKER, and SOTOMAYOR, Circuit Judges.
 Judge Sotomayor dissents with a separate opinion.
 JON O. NEWMAN, Circuit Judge.
 
 
 1
 This appeal presents an issue not previously litigated in this Court: whether a suit is within the jurisdiction of a federal district court or the United States Supreme Court. The precise issue is whether a suit brought by a State against officers of another State should be deemed to be against the other State itself, in which event it would lie within the Supreme Court's "original and exclusive jurisdiction of all controversies between two or more States." 28 U.S.C. § 1251(a) (1994).
 
 
 2
 The issue arises on an appeal by Plaintiff-Appellant State of Connecticut from a judgment of the United States District Court for the Northern District of New York (Frederick J. Scullin, Jr., Judge) dismissing, for lack of jurisdiction, Connecticut's suit for declaratory and injunctive relief against Defendants-Appellees John P. Cahill and Donald W. Brewer. The Defendants are officers of the State of New York charged with enforcing a law that allows resident New York commercial permit-holders to trap lobsters in a small but quite productive area near Fishers Island, New York, but forbids nonresident commercial permit-holders from lobstering in the area. Connecticut's complaint alleges that the Defendants are enforcing an unconstitutional New York statute. The District Court ruled that the suit is a "controvers[y] between two or more States" falling within the Supreme Court's original and exclusive jurisdiction under 28 U.S.C. § 1251(a). We disagree and therefore vacate the judgment and remand for further proceedings in the District Court.
 
 Background
 
 3
 The relevant facts are undisputed. The State of New York's Environmental Conservation Law creates a two-tiered system for commercial lobstering. Lobstermen[1] domiciled in New York and in States--including Connecticut--that give reciprocal permits or licenses to those domiciled in New York may obtain New York commercial lobstering permits, but those not domiciled in New York may not take lobsters from a designated area of New York waters in Long Island Sound near Fishers Island. See N.Y. Envtl. Conserv. Law § 13-0329(1), (2)(a) (McKinney 1997 & Supp. 1999). The island lies between Block Island Sound and Long Island Sound near the eastern Connecticut coastline, but is part of the State of New York, and the restricted waters nearby are an exceptionally fertile lobster bed.
 
 
 4
 In November 1997, Gordon C. Colvin, the Director of Marine Resources for the New York Department of Environmental Conservation (DEC), sent a letter to the Fishers Island Lobstermen's Association informing them that the DEC was no longer enforcing the restriction because DEC concluded that the provision was probably unconstitutional. However, in February 1998, Appellee Donald W. Brewer, Director of DEC's Division of Law Enforcement, sent letters to several Connecticut permit holders informing them that New York "is enforcing this law and you are hereby advised to refrain from fishing these restricted waters." Since that time, officers under the Appellees' authority have ticketed and fined Connecticut lobstermen for taking lobsters from Fishers Island waters.
 
 
 5
 The State of Connecticut brought suit in the United States District Court for the Northern District of New York on April 8, 1998. Connecticut, acting as parens patriae, sought a declaration that the New York restriction was facially unconstitutional under the Commerce Clause as discriminatory against non-New Yorkers, and sought an injunction forbidding the Appellees from enforcing the restriction. The Appellees initially filed counterclaims, but they later discontinued them. The parties filed motions for summary judgment, arguing both the merits of the constitutional issue and whether the District Court had subject matter jurisdiction over the action. In an unpublished decision, the District Court ruled that the State of New York was the sole real defendant-party in interest and dismissed the suit for lack of subject matter jurisdiction because the suit was a "controvers[y] between two or more States" within the Supreme Court's exclusive original jurisdiction. See 28 U.S.C. § 1251(a). Judge Scullin also denied as moot a motion to intervene filed by Connecticut lobsterman Vivian T. Volovar. Volovar subsequently filed her own suit against the Appellees. See Volovar v. Cahill, No. 99-CV-718 (FJS/DRH) (N.D.N.Y. filed May 5, 1999).
 
 Discussion
 
 6
 The Constitution confers on the United States Supreme Court original jurisdiction to hear cases "in which a State shall be Party," as well as appellate jurisdiction over "Controversies between two or more States." U.S. Const. art. III, § 2, cl. 1-2. Congress has vested in the Supreme Court "original and exclusive jurisdiction of all controversies between two or more States," 28 U.S.C. § 1251(a) (emphasis added), thus declining to vest lower federal courts with original jurisdiction over such cases. In considering the criteria that identify a suit within the Supreme Court's exclusive jurisdiction, we will examine a State's role as plaintiff, a plaintiff-State's options concerning the identity of defendant-parties, and considerations that place a limited category of suits brought by a plaintiff-State within the Supreme Court's exclusive jurisdiction. We will then apply these criteria to the pending case.
 
 I. States as Plaintiffs
 
 7
 The parties do not dispute that Connecticut has standing to bring this suit in its parens patriae capacity. However, a review of the interests that plaintiff-States have sought to protect in the federal courts will illuminate our discussion of whether this suit is a controversy between two States.
 
 
 8
 Plaintiff-States generally bring suit in the federal courts in one of three standing capacities: (1) proprietary suits in which the State sues much like a private party suffering a direct, tangible injury, see, e.g., South Dakota v. North Carolina, 192 U.S. 286, 312 (1904) (suit for payment of defaulted North Carolina bonds held by South Dakota); Texas v. New Mexico, 482 U.S. 124, 126 (1987) (enforcement of interstate compact); (2) sovereignty suits requesting adjudication of boundary disputes or water rights, see, e.g., Rhode Island v. Massachusetts, 37 U.S. (12 Pet.) 657, 726-27 (1838) (boundary dispute); or (3) parens patriae suits in which States litigate to protect "quasi-sovereign" interests. See Alfred L. Snapp & Son, Inc. v. Puerto Rico, 458 U.S. 592, 601-02 (1982). See generally Richard H. Fallon, Daniel J. Meltzer & David L. Shapiro, Hart and Wechsler's The Federal Courts and the Federal System 311-22 (4th ed. 1996) ("Hart and Wechsler").
 
 
 9
 Under the parens patriae doctrine, a State's "quasi-sovereign" interests "consist of a set of interests ... in the well-being of its populace" that are "sufficiently concrete to create an actual controversy between the State and the defendant." Alfred L. Snapp & Son, Inc., 458 U.S. at 602. The doctrine is not limited to suits between States, but also applies to suits in which the defendant is not a State. See, e.g., id. A State possesses a quasi-sovereign interest in the "health and well-being--both physical and economic--of its residents in general," as well as in "not being discriminatorily denied its rightful status within the federal system," id. at 607. See generally 1 Laurence H. Tribe, American Constitutional Law 453-56 (3d ed. 2000) (collecting cases brought in parens patriae capacity); Hart and Wechsler 316-22; 32 Am. Jur. 2d Federal Courts § 563 (1995 & Supp. 1999).
 
 
 10
 The Supreme Court has exercised original jurisdiction over suits brought by States acting as parens patriae against other States, sometimes adjudicating claims that a law of the defendant State violated the Commerce Clause. See, e.g., Maryland v. Louisiana, 451 U.S. 725, 737 (1981) (challenging Louisiana tax on the "first use" of previously untaxed natural gas coming into the State); Pennsylvania v. West Virginia, 262 U.S. 553, 591-92 (1923) (challenging West Virginia statute limiting the export of natural gas from West Virginia). See generally Peter D. Enrich, Saving the States from Themselves: Commerce Clause Constraints on State Tax Incentives for Business, 110 Harv. L. Rev. 377, 418-22 (1996) (reviewing States' role as plaintiffs in bringing Commerce Clause claims against other States). We observe that in such suits, the plaintiff-States often pursued the same declaratory and injunctive relief that a private plaintiff might have sought in an action grounded on Ex parte Young, 209 U.S. 123 (1908). See Wyoming v. Oklahoma, 502 U.S. 437, 451-52 (1992).
 
 
 11
 II. Plaintiff-States' Choice to Name a Defendant-Party
 
 
 12
 In the context of requests to exercise its exclusive and original jurisdiction over disputes between States, the Supreme Court has broadly intimated that a plaintiff-State may generally choose whether or not to name another State as a defendant in litigation challenging some action or statute of the other State.
 
 
 13
 Two decisions in particular support the proposition that, subject to the qualification explained in Part III, infra, a plaintiff-State may choose between naming a State as the defendant and suing in the Supreme Court or naming another proper defendant and suing in a district court. In Missouri v. Illinois, 180 U.S. 208 (1901), Missouri invoked the Supreme Court's original jurisdiction to enjoin the dumping of raw sewage by the Sanitary District of Chicago into a canal draining into the Mississippi River. The Court accepted jurisdiction, and rejected the State of Illinois's argument that it was not a proper defendant:
 
 
 14
 The object of the bill is to subject this public work to judicial supervision, upon the allegation that the method of its construction and maintenance will create a continuing nuisance, dangerous to the health of a neighboring State and its inhabitants. Surely, in such a case [i.e., brought against only the Sanitary District of Chicago], the State of Illinois would have a right to appear and traverse the allegations of the bill, and, having such a right, might properly be made a party defendant.
 
 
 15
 Id. at 242. The inference from this quotation is that in a dispute where a State can be a defendant, a plaintiff-State suing another proper defendant need not name that State as a defendant, although the intervention of that State would be proper (and would presumably invoke Supreme Court jurisdiction).
 
 
 16
 The Court confirmed this interpretation in Illinois v. City of Milwaukee, 406 U.S. 91 (1972). In that case, the State of Illinois sought to invoke original and exclusive Supreme Court jurisdiction in a suit to enjoin Milwaukee, its agencies, and three other Wisconsin cities from discharging allegedly raw or untreated sewage into Lake Michigan. See id. at 93. The Supreme Court determined that exclusive jurisdiction did not exist because the cities were not instrumentalities of the State, but rather were independent entities. See id. at 98. The Court revisited the reasoning of Missouri v. Illinois, commenting that "while, under appropriate pleadings, Wisconsin could be joined as a defendant in the present controversy, it is not mandatory that it be made one." Illinois v. City of Milwaukee, 406 U.S. at 97.
 
 
 17
 Although Missouri v. Illinois and Illinois v. City of Milwaukee concerned the appropriateness of naming as a defendant a State, rather than another political subdivision, we think that their underlying reasoning is relevant to the present case. These cases indicate that a plaintiff-State may decide whether or not to name another State as a defendant, and to enjoy (or suffer) the jurisdictional consequences of that decision. We need not consider all the consequences of intervention because the State of New York, undoubtedly aware of the instant suit against its officials, has not sought to intervene.
 
 
 18
 To summarize, we believe that the Supreme Court has afforded plaintiff-States considerable freedom to name, or to decline to name, another State as defendant in suits seeking declaratory and injunctive relief from the official acts of that State, its officers, or political subdivisions. That option strongly suggests that Connecticut, having elected to sue only New York officers, but not New York, may proceed in the District Court. The option does not definitively resolve the jurisdictional issue, however, because the Appellees contend that the particular claim against them in this lawsuit must be regarded as a claim against the State.
 
 
 19
 III. When a State Must Be Named As a Defendant
 
 
 20
 Before considering the critical issue of when a State must be regarded as the real party-defendant, we note preliminarily that in the only reported case where a State's suit against officers of another State was resisted on the ground that the suit belonged in the exclusive jurisdiction of the Supreme Court as a suit against a State, it was the State of New York that successfully persuaded a federal court to reject the argument. See New York v. Brown, 721 F. Supp. 629, 633-34 (D.N.J. 1989).[2] Ironic as that circumstance is, we doubt that it creates anything like an estoppel against the State of New York, even though the State's Attorney General is now advancing on behalf of the Appellees the argument it successfully opposed in Brown.
 
 
 21
 In our view, a State whose officers' action is challenged must be considered the real party in interest--and thus must be named as a defendant--where (1) the alleged injury was caused by actions specifically authorized by State law, and (2) the suit implicates the State's core sovereign interests. First, a State is not the real party in interest where the alleged injury was caused by arbitrary or improper administration of valid State laws, see Louisiana v. Texas, 176 U.S. 1, 22 (1900), as distinct from actions properly carried out and specifically authorized by the State law alleged to be unconstitutional, see Pennsylvania v. West Virginia, 262 U.S. at 591; New York v. New Jersey, 256 U.S. 296, 302 (1921); Missouri v. Illinois, 180 U.S. at 242.
 
 
 22
 Second, the importance of focusing on core sovereign interests in this context is apparent from the Supreme Court's own pronouncements about which cases are most appropriate for the exercise of its discretionary authority to exercise its original jurisdiction over controversies between States. The Court looks primarily at "the seriousness and dignity of the claim," Mississippi v. Louisiana, 506 U.S. 73, 77 (1992) (internal quotation marks omitted), and attempts to focus its limited resources on cases that "implicate[] serious and important concerns of federalism," Wyoming v. Oklahoma, 502 U.S. at 451 (internal quotation marks omitted).
 
 
 23
 In Alfred L. Snapp & Son, Inc., Justice Brennan observed:
 
 
 24
 The Framers, in establishing original jurisdiction in this Court for suits "in which a State shall be a Party," and Congress, in implementing the grant of original jurisdiction with respect to suits between States, may well have conceived of a somewhat narrower category of cases as presenting issues appropriate for initial determination in this Court than the full range of cases to which a State may have an interest cognizable by a federal court. The institutional limits on the Court's ability to accommodate such suits accentuates the need for more restrictive access to the original docket.
 
 
 25
 458 U.S. at 611 (Brennan, J., concurring) (citations omitted).
 
 
 26
 Indeed, some justices have gone so far as to suggest that the Court explicitly limit itself to such cases. For example, in Maryland v. Louisiana, 451 U.S. 725 (1981), then-Justice Rehnquist stated:
 
 
 27
 I would require that the State's claim involve some tangible relation to the State's sovereign interests. Our original jurisdiction should not be trivialized and open to run-of-the-mill claims simply because they are brought by a State, but rather should be limited to complaints by States qua States. This would include the prototypical original action, boundary disputes, and the familiar cases involving disputes over water rights. In such cases, the State seeks to vindicate its rights as a State, a political entity.
 
 
 28
 Id. at 766 (Rehnquist, J. (now C.J.), dissenting); see also Ann Woolhandler & Michael G. Collins, State Standing, 81 Va. L. Rev. 387, 515-16 (1995) (identifying paradigmatic interstate controversies as concerning "state contracts, debts, boundaries, interstate escheat, interstate limited fund taxation, and resource allocation").
 
 
 29
 While these cases do not control the question we face here, they plainly teach that the rationale for the Court's original jurisdiction is strongest where core sovereign interests are at stake. Accordingly, we believe that, in cases implicating these interests, the State itself must be considered the real party in interest regardless of whether its officers or instrumentalities are the nominal defendants. In the absence of such core interests, however, a State's injunction suit against State officers, which the Supreme Court would not regard as a suit against the State requiring the exercise of its original jurisdiction, may properly proceed in a district court.
 
 
 30
 The Appellees' contrary argument has three steps: (1) Young allows federal court suits against state officers for injunctive and declaratory relief not to be considered suits against a State in order to avoid the barrier of the Eleventh Amendment; (2) suits by a State do not encounter an Eleventh Amendment obstacle, see Texas v. New Mexico, 482 U.S. at 130; (3) a State's suit for injunctive and declaratory relief against another State's officers should therefore be considered a suit against that State because the Young rationale need not be invoked.
 
 
 31
 While we agree that the holding of Young is not directly applicable here, we think that the underlying principle of Young is not as limited as the Appellees' argument suggests and that some aspects of the Young line of cases are relevant to our pending issue. Suits to enjoin the unlawful actions of government officials have a rich history in the Anglo-American tradition. See United States v. Lee, 106 U.S. 196, 220 (1882) ("No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it."). See generally Hart and Wechsler 1015-17; Louis L. Jaffe, Suits Against Governments and Officers: Sovereign Immunity, 77 Harv. L. Rev. 1 (1963). In the American context, the contours of this right to challenge official action have evolved most often in cases that have elaborated the scope of state immunity to suit under the Eleventh Amendment. But, like other landmark decisions, the core principle underlying Young has broader application than the context in which it was announced.[3] Suits like Young have proceeded against both State and federal officers; the latter group is, of course, not subject to the Eleventh Amendment. See, e.g., United Public Workers of America v. Mitchell, 330 U.S. 75, 81-82 (1947); Lee, 106 U.S. at 220. Similar principles apply in these suits, whether against State or federal officials. See, e.g., Great Northern Life Insurance Co. v. Read, 322 U.S. 47, 50-51 (1944) (analyzing suits against both federal and State officials); Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 709-10 (1949) (Frankfurter, J., dissenting) (same); Hart and Wechsler 1015-17 ("[Young's] principle has been easily absorbed in suits challenging federal official action."). We make this comparison between State and federal officers to demonstrate that the principles governing suits for injunctive relief against unlawful official action do not vary based on the applicability of the Eleventh Amendment. Rather, we think these principles apply more broadly--to all cases implicating sovereign immunity.
 
 
 32
 Of course, since a State does not enjoy sovereign immunity from suit by another State in federal court, the principles of Youngare not directly applicable here. Nevertheless, we think the reasoning of those cases (whether concerning unlawful actions of State or federal officials) is helpful in determining whether a particular suit implicates another State's core sovereign interests, thus requiring that the other State be treated as the real defendant-party in interest. Most notably, the Young cases reflect the principle that a State is the only real defendant-party in interest when damages are sought, although that State's officials alone may still be sued for prospective injunctive relief. See, e.g., Will v. Michigan Department of State Police, 491 U.S. 58, 71 n.10 (1989) ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'") (quoting Kentucky v. Graham, 473 U.S. 159, 167 n.14 (1985), and citing Young); Edelman v. Jordan, 415 U.S. 651, 677 (1974); Ford Motor Co. v. Department of Treasury of Indiana, 323 U.S. 459, 463 (1945) (suit for monetary relief naming a state officer nonetheless "constitutes an action against the State of Indiana"); In re State of New York, 256 U.S. 490, 500-02 (1921). This rule springs from the principle that a financial judgment against a State requires the depletion of the State treasury, a crucial instrument of sovereignty. Similarly, the Supreme Court's decision in Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261 (1997), held that a suit against State officers contesting a State's sovereignty over submerged lands is barred in federal court under the Eleventh Amendment because it "is the functional equivalent of a quiet title action which implicates special sovereignty interests." Id. at 281. These and other cases in the Young line provide guidance concerning when a suit implicates core sovereign interests, thus making the State a required defendant.
 
 
 33
 The guidance from these cases is applicable to suits brought by a plaintiff-State. Thus, when a plaintiff-State's suit, nominally against state officers, concerns another State's core sovereign interests, the other State is the real defendant-party in interest, and that suit is within the original and exclusive jurisdiction of the Supreme Court. However, when a suit does not implicate a core area of a sister State's sovereignty, a plaintiff-State may opt to name that State's enforcement officers alone, or to name the State itself.[4]
 
 
 34
 Important consequences will follow from a plaintiff-State's decision whether to name another State as defendant. As the Appellant has noted, a plaintiff-State might sue a defendant-State and attempt to invoke the exclusive jurisdiction of the Supreme Court, only to have the Court decline to exercise its jurisdiction. See, e.g., Louisiana v. Mississippi, 488 U.S. 990 (1988) (denying leave to file); Arizona v. New Mexico, 425 U.S. 794, 797 (1976) (declining to exercise exclusive jurisdiction over Commerce Clause challenge to New Mexico energy tax when an alternative forum existed in state court).[5] In contrast, with few exceptions, a federal district court has a "virtually unflagging obligation" to hear a case when subject matter jurisdiction exists. Colorado River Water Conservation District v. United States, 424 U.S. 800, 817 (1976); see also Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 404 (1821).
 
 
 35
 Moreover, the availability of remedies is not the same in each forum. With respect to cases decided in its original jurisdiction, the Supreme Court has repeatedly instructed that "[b]y ratifying the Constitution, the States gave [the Supreme] Court complete judicial power to adjudicate disputes among them." Texas v. New Mexico, 482 U.S. at 128 (emphasis added). In contrast, when a plaintiff-State sues the officers of a sister State in a lower federal court, remedies that operate directly against the State are not available. Cf. Pennsylvania v. West Virginia, 262 U.S. at 591 (noting the possibility of an alternative suit for injunctive relief against State officers).
 
 
 36
 Furthermore, our decision comports with the Supreme Court's concern that some judicial forum be available for the resolution of conflicts of this nature.[6] In deciding whether to exercise its discretionary original jurisdiction in controversies between States, one of the factors the Court has emphasized is "the availability of an alternative forum in which the issue tendered can be resolved." Mississippi v. Louisiana, 506 U.S. at 77. Our reading of section 1251 essentially requires plaintiff-States to invoke the Court's original jurisdiction only in those cases where the Court is most likely to exercise that jurisdiction, i.e., where core sovereign interests of the States are at stake. By contrast, where no such interests are implicated, and hence the Court is unlikely to accept the case within its original jurisdiction, our reading would allow a plaintiff-State to sue State officers for injunctive relief in a district court. In the limited set of cases in which core sovereign interests are implicated but the Supreme Court nevertheless declines to exercise its exclusive jurisdiction, leaving the plaintiff-State without a forum, we think it likely that private parties will have strong incentives to sue in a district court, under the Young rationale, to obtain whatever injunctive relief a plaintiff-State would seek, although the Eleventh Amendment will bar a damages remedy.
 
 
 37
 Finally, we note the appropriateness of federal district courts (subject to court of appeals and ultimately Supreme Court review) to decide issues like the claim of unconstitutionality presented here. They do so regularly and, where warranted, may issue the same relief sought here against State enforcement officers as the Supreme Court may issue in suits against defendant-States. See Pennsylvania v. West Virginia, 262 U.S. at 591 ("The complainant State asserts and the defendant State denies that such a withdrawal is an interference with interstate commerce forbidden by the Constitution. This is essentially a judicial question. It concededly is so in suits between private parties, and of course its character is not different in a suit between States."). We do not require that these issues always be resolved by "the highest judicatory in the nation," The Federalist No. 81, at 487 (Alexander Hamilton) (Clinton Rossiter ed. 1961), as the Appellees urge here. Cf. James E. Pfander, Rethinking the Supreme Court's Original Jurisdiction in State-Party Cases, 82 Calif. L. Rev. 555, 654 (1994) (rejecting the "dignified tribunal" justification for the Supreme Court's original jurisdiction, and arguing that it was intended to provide, among other things, a forum for review of unconstitutional state laws in the absence of constitutionally established inferior federal courts). The propriety of naming a State official as a defendant in a district court should not vary with the identity of the plaintiff.
 
 IV. The Present Case
 
 38
 Applying these principles to the present case, we conclude that the State of Connecticut is not required to bring this suit against the State of New York and that summary judgment should not have been granted. Of the two criteria we have identified for regarding a suit against State officers as a suit against a State for purposes of section 1251(a), Connecticut's suit satisfies the first criterion but not the second criterion. The alleged injury was caused by actions of State officers specifically authorized by State law, but the suit does not implicate core sovereign interests. It is a traditional equal protection claim against State officers of the sort regularly litigated in district courts, and it is not within the Supreme Court's exclusive jurisdiction.
 
 
 39
 Our dissenting colleague disagrees with our conclusion and contends that it disregards the plain meaning of section 1251(a)'s phrase, "all controversies between two or more States." However, since New York has not been sued and has elected not to intervene, the suit on its face is not within the plain meaning of section 1251(a). The issue is whether Connecticut's suit, nominally brought against New York officers, should be considered a suit against a State for purposes of invoking the Supreme Court's exclusive jurisdiction. That issue may be a matter for fair dispute, but our decision that the suit should not be considered a suit between States does not disregard the plain meaning of a statute whose terms are limited to such suits.[7]
 
 
 40
 The amici argue that because this suit implicates fishing rights, it is the sort of dispute between two sovereigns that must be heard in the original jurisdiction of the Supreme Court. With a dire reminder that the Supreme Court's original jurisdiction is available for disputes that "would amount to casus belli if the States were fully sovereign," Texas v. New Mexico, 462 U.S. 554, 571 n.18 (1983), the amici point to two cases concerning fishing rights that were decided by the Supreme Court exercising its original jurisdiction. In Louisiana v. Mississippi, 202 U.S. 1 (1906), the Court adjudicated a maritime boundary dispute between the involved States. The controversy came to a head because the neighboring States had different regulations concerning the permissible methods of oyster harvesting, and each State was enforcing its regulations in areas over which the other State claimed to enjoy sovereignty. Id. at 9-11. The States assembled commissions to clearly identify and mark the boundaries between the two States with buoys, but that effort failed, and so the States brought a "friendly suit" in the Supreme Court. Id. at 11. In Washington v. Oregon, 211 U.S. 127 (1908), another boundary dispute case concerning the Columbia River, the Court noted that state fishery grant rights were implicated by the decision which State enjoyed sovereignty over a portion of the river. See id. at 136.
 
 
 41
 Both of these cases are distinguishable from the present case because they were paradigmatic boundary dispute cases. In neither one did the Supreme Court exercise its original jurisdiction simply because the subject matter concerned fishing rights. See Louisiana v. Mississippi, 202 U.S. at 33 ("It is apparent that the enforcement of the oyster legislation of the two States led to a conflict between the authorities of both, which involved a dispute as to the true boundary line."). The present suit does not concern New York's sovereign authority, versus that of another State, to regulate commercial lobstering in the restricted waters near Fishers Island, as a boundary dispute would. Nor does the present suit seek to establish a property right in, or equitable apportionment of, lobsters to the State of Connecticut or its citizens. Cf. Idaho v. Oregon, 444 U.S. 380, 385 (1980) (seeking equitable apportionment of migratory fish from downriver States). Rather, this suit challenges as unconstitutional the manner in which New York has exercised its unchallenged power to regulate its waters.
 
 Conclusion
 
 42
 For all the reasons discussed above, we conclude that Connecticut may name the New York officers entrusted with enforcing an allegedly unconstitutional law as the sole defendants in a district court suit seeking only declaratory and injunctive relief. This suit does not implicate a core aspect of New York's sovereignty, and seeks no relief that would require the State of New York to disburse funds from its treasury to the State of Connecticut. The State of New York is not a named party in this suit. This suit is not a "controvers[y] between two or more States" within the meaning of 28 U.S.C. § 1251(a). Because the federal question jurisdiction of the District Court has not been displaced by section 1251(a), we vacate the judgment and remand for further proceedings.
 
 
 
 NOTES:
 
 
 [1]
 1 At oral argument, we were informed that women who take lobsters commercially prefer the label "lobstermen."
 
 
 [2]
 At least two commentators appear to consider uncontroversial the position that a district court has jurisdiction over suits like the present one. See Ann Woolhandler & Michael G. Collins, State Standing, 81 Va. L. Rev. 387, 499 & n.452 (1995) (discussing the availability of forums alternative to the Supreme Court for controversies implicating the interests of two or more States).
 
 
 [3]
 We agree with the dissent that Young is a limited doctrine, but we think the Supreme Court has emphasized its limitations to assure that the remedies permitted by Young are carefully circumscribed, see Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 102-03 (1984), and that State sovereign immunity is preserved, see Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 281 (1997) ("We must examine the effect of the Tribe's suit and its impact on these special sovereignty interests in order to decide whether the Ex Parte Young fiction is applicable."). Neither concern is implicated by Connecticut's pending lawsuit.
 
 
 [4]
 We emphasize that, consistent with our analysis, supra, Part II, a plaintiff-State may name another State as a defendant even if it seeks no more relief than would be available against that other State's officers alone. In such a situation, jurisdiction would not exist in the lower federal courts.
 
 
 [5]
 The Supreme Court's decision not to exercise its exclusive jurisdiction does not create original jurisdiction in a federal district court between the same parties where none otherwise exists. See Mississippi v. Louisiana, 506 U.S. at 77-78.
 
 
 [6]
 The dissent suggests that the concern for an available forum is less relevant in this case because of the pendency in the District Court of the Volovar suit by a private citizen, challenging the same statute that Connecticut challenges. But that concern should not depend on whether a private citizen elects to file and pursue a lawsuit. If, as we believe, Connecticut is entitled to proceed in the District Court, it need not rely on the uncertain litigation steadfastness of a private citizen.
 
 
 [7]
 We appreciate the dissent's contention that our decision can be viewed as an encroachment on the Supreme Court's prerogative to determine the scope of its exclusive original jurisdiction. But we believe our decision shows respect for the High Court by following what we understand to be its teachings to reach a result that reduces the need to petition the Court for leave to file cases that do not appear to meet its criteria for exercise of its exclusive jurisdiction. Our decision also avoids the risk that if such petitions are denied, a plaintiff-State that has brought a suit like the pending one will be left without any forum.
 If our view of section 1251(a) is not shared by the Supreme Court, it may of course reject our view by granting review of this decision. See Taylor v. Atlantic Maritime Co., 181 F.2d 84, 85 (2d Cir. 1950) (identifying availability of Supreme Court review by certiorari as sufficient reason for declining to certify question to Supreme Court under 28 U.S.C. § 1254(2)); see also Wisniewski v. United States, 353 U.S. 901, 902 (1957) (dismissing certification of question and emphasizing "task of a Court of Appeals to decide all properly presented cases coming before it"). Our decision frames the issue for the Court, if it wishes to grant review, but does not burden the Court with a series of petitions to invoke the Court's original jurisdiction, a consequence of the dissent's position.
 
 
 SOTOMAYOR, Circuit Judge, dissenting:
 
 43
 The majority advances a novel reading of 28 U.S.C. § 1251(a) (1994), i.e., that the Supreme Court's "exclusive" jurisdiction over "all controversies between two or more States," id. (emphasis added), is not exclusive if a plaintiff-State's complaint does not actually name a State in the caption and if the dispute is not too important. As a policy matter, I do not disagree that this creative approach to § 1251(a) makes the resolution of seemingly less weighty disputes between States more efficient, faster, and thus likely more desirable for the States and, perhaps, the busy Supreme Court as well. But the majority's interpretation of §1251(a) is contrary to the plain meaning of the statute-"exclusive jurisdiction of all controversies," id. (emphasis added)-and depends upon a questionable reading of Supreme Court precedent. I therefore respectfully dissent.
 
 I. Section 1251(a) Exclusive Jurisdiction
 
 44
 Section 1251(a) makes clear that the Supreme Court's jurisdiction is "exclusive" for "all" controversies between States. Id. There is nothing in the language of the statute, its legislative history, or Supreme Court case law stating that the Supreme Court's exclusive jurisdiction over such controversies may be concurrent with lower federal courts depending upon the nature of the interstate dispute. The Supreme Court has clearly so held. See Mississippi v. Louisiana, 506 U.S. 73, 77-78 (1992) ("[T]he uncompromising language of 28 U.S.C. § 1251(a) . . . gives to this Court 'original and exclusive jurisdiction of all controversies between two or more States.' Though phrased in terms of a grant of jurisdiction to this Court, the description of our jurisdiction as 'exclusive' necessarily denies jurisdiction of such cases to any other federal court. This follows from the plain meaning of 'exclusive' . . . .") (footnote and citation omitted).
 
 
 45
 Moreover, Congress could have required exclusive Supreme Court jurisdiction for any controversy in which a State is a party, but it did not. See 28 U.S.C. § 1251(b)(2) (granting "original but not exclusive" Supreme Court jurisdiction over suits between the United States and a State); id. § 1251(b)(3) (granting "original but not exclusive" Supreme Court jurisdiction over suits by a State against citizens of another State). Congress specifically singled out controversies between two States and mandated that these particular suits be adjudicated exclusively before the Supreme Court-regardless of the nature of the underlying dispute. We must not take that congressional command lightly.
 
 
 46
 Thus, this case boils down to one issue: whether Connecticut's suit is, in fact, a controversy with New York. If so, it is subject to the Supreme Court's exclusive jurisdiction.
 
 II. Controversy Between States
 
 47
 It can hardly be disputed that, at its core, this action is a conflict between the States of Connecticut and New York. Connecticut seeks to have Section 13 0329(2)(a) of the New York Environmental Conservation Law, which favors New York State lobstermen, declared unconstitutional under the Commerce Clause of the U.S. Constitution and to enjoin further enforcement of New York's law. See Compl. at 5-6 (Relief Sought). This is a typical controversy between two or more States. See, e.g.,Wyoming v. Oklahoma, 502 U.S. 437 (1992) (Commerce Clause challenge to Oklahoma's regulation requiring in-state power plants to burn Oklahoma-mined coal); Maryland v. Louisiana, 451 U.S. 725 (1981) (Commerce Clause challenge to Louisiana's tax on natural gas imports); Pennsylvania v. West Virginia, 262 U.S. 553 (1923) (Commerce Clause challenge to West Virginia's regulations requiring that in-state natural gas supplies be first supplied to West Virginia residents).
 
 
 48
 The mere fact that Connecticut declined to name New York as a defendant and instead named two New York State officials does not alter this conclusion, because we must look past the pleadings to identify the real parties in interest. See Arkansas v. Texas, 346 U.S. 368, 371 (1953) (looking "behind and beyond the legal form in which the claim of the State is pressed" and finding that the defendant State of Arkansas was the "real party in interest" where Texas interfered with a contract with the University of Arkansas). In determining who is the real party in interest, the "general rule" is that relief sought nominally against an officer is in fact against the sovereign if "the effect of the judgment would be to restrain the Government from acting, or to compel it to act." Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 101 & n.11 (1984); Hawaii v. Gordon, 373 U.S. 57, 58 (1963) (per curiam); Dugan v. Rank, 372 U.S. 609, 620 (1963).
 
 
 49
 Here, Connecticut named John Cahill and Donald Brewer, respectively New York's Commissioner of Environmental Conservation and Director of the Division of Law Enforcement for the Department of Environmental Conservation, in their official capacities precisely because Cahill and Brewer are the New York State officials charged with enforcing New York's allegedly unconstitutional lobstering law. See Compl. paras. 5, 6. Moreover, there is no allegation that the named defendants acted beyond the scope of their powers while carrying out the subject law, see Compl. paras. 5, 6, 8, the only type of claim that might convert this action from a controversy with another State into a dispute with an individual, named defendant, see Louisiana v. Texas, 176 U.S. 1, 22 (1900) (holding that Louisiana's suit against the Governor of Texas for enacting regulations "in abuse or excess of [his] powers" was not a controversy between two States). Thus, there can be no serious doubt that even though this action was brought nominally against Cahill and Brewer, it is an action by Connecticut against New York.
 
 
 50
 Accordingly, § 1251(a) applies to this case, this case therefore rests exclusively within the Supreme Court's jurisdiction, and we should affirm the district court's judgment dismissing the action for lack of jurisdiction. The disposition of this appeal is that simple. The majority, however, declines to apply this logical, straightforward application of § 1251(a) and, instead, manufactures concurrent jurisdiction for this case in the lower federal courts. In so doing, the majority reads an exceptional caveat into the "all controversies" language of § 1251(a) and frustrates the statute's "exclusive" provision.
 
 III. The Majority's Approach
 
 51
 The majority first presumes that a plaintiff-State has "considerable freedom" to name whomever it chooses as a defendant (including State officials) when seeking adjudication of its dispute with another State. Ante at 97-99. That proposition goes far beyond what the Supreme Court has actually said regarding a plaintiff-State's ability to frame its complaint. Second, the majority concludes that a plaintiff-State's "considerable freedom" is only limited if supposed "core sovereign interests" of the States are at stake. Ante at 99-100. That permissive standard allows a subset of "all controversies" to be brought in the lower federal courts and divests the Supreme Court of its ability to determine which interstate controversies it will hear. Finally, the majority defends its creation of concurrent jurisdiction in the lower federal courts by uprooting the doctrine of Ex Parte Young, 209 U.S. 123 (1908), from its foundation in the law of sovereign immunity and artificially transplanting it into the area of Supreme Court jurisdiction. See ante at 100-02. Although recognizing that the doctrine of Young is "not directly applicable" here, ante at 101, the majority fails to acknowledge that the Young doctrine is a "legal fiction" that arose in a narrow context, has been limited continually by the Supreme Court, and, if at all relevant to this case, teaches that federal jurisdiction should not be readily expanded.
 
 
 52
 Thus, in addition to contravening the clear command of § 1251(a), the majority's approach to jurisdiction over controversies between two States suffers from its flawed application of Supreme Court precedent.
 
 A. A Plaintiff-State's Discretion
 
 53
 The majority begins with the proposition that the Supreme Court has "broadly intimated" that a State has considerable discretion to name defendants as it chooses. See ante at 97-98. I take no issue with the proposition that a plaintiff-State has discretion to name defendants when preparing its complaint, but whatever "considerable freedom" the majority supposes a plaintiff-State possesses in so doing, ante at 98-99, is still constrained by the requirement that courts look beyond the form of the pleadings and determine who is the real party being sued. See Arkansas v. Texas, 346 U.S. at 371 ("[W]e of course look behind and beyond the legal form in which the claim of the State is pressed. We determine whether in substance . . . the State is indeed the real party in interest."). Thus, although Connecticut may have chosen to name only New York State officials as defendants, jurisdiction in this case does not turn on Connecticut's choice, because, as discussed supra, this action is fundamentally a dispute with the State of New York.
 
 
 54
 Although it is clear that a plaintiff-State's choice of named defendants does not change the inherent nature of the lawsuit for jurisdictional purposes, the majority nevertheless concludes that, subject only to the limitation discussed in section III.B. infra, a plaintiff-State may opt to sue a State official in the lower federal courts and seek relief against the State. The majority's reading of Supreme Court precedent from which it derives this proposition is an overstatement of what, if anything, the Supreme Court has actually said on the matter. Specifically, the majority relies on language in Missouri v. Illinois, 180 U.S. 208 (1901), and Illinois v. City of Milwaukee, 406 U.S. 91 (1972). Those cases address whether a State was properly made a defendant for the purpose of invoking the Supreme Court's exclusive jurisdiction, but neither even suggests that a plaintiff-State may bypass §1251(a) by naming solely State officials as defendants in actions where the State is the real party in interest.
 
 
 55
 In Missouri v. Illinois, the Supreme Court addressed whether Illinois was properly made a defendant in Missouri's action to enjoin the Sanitary District of Chicago from dumping sewage into the Mississippi River. See 180 U.S. at 241-43. In concluding that Illinois was a proper defendant, the Supreme Court advanced several reasons, including the observation that if a suit had been brought against the Sanitary District of Chicago alone, "the State of Illinois would have a right to appear and traverse the allegations of the bill, and, having such a right, might properly be made a party defendant" in the action at bar. Id. at 242. That statement may suggest that there are disputes for which Missouri could sue the Sanitary District of Chicago alone in a lower federal court, but it is hardly an indication that, in derogation of §1251(a) exclusivity, a suit by Missouri against the Sanitary District could go forward in that court if it were deemed a controversy with Illinois. Accordingly, the Supreme Court's language tells us very little about whether a plaintiff-State may sue another State's officials acting in their official capacities when seeking relief against the other state.
 
 
 56
 Illinois v. City of Milwaukee also provides scant, if any, support for the majority's proposition. In rejecting Illinois's attempt to invoke the Supreme Court's exclusive jurisdiction over its dispute with the City of Milwaukee, Milwaukee's agencies, and three additional Wisconsin cities, the Supreme Court held that the dispute at issue was not a controversy between two States because those entities were citizens of Wisconsin and not arms of Wisconsin itself. See id. at 97-98 ("It is well settled that . . . political subdivisions are citizens of their respective states."). In fact, the Supreme Court clearly noted that if it were to exercise jurisdiction over that suit, jurisdiction would be based on its "original but not exclusive" jurisdiction under §1251(b)(3) (providing "original but not exclusive" Supreme Court jurisdiction over suits by a State against citizens of another State), and not its exclusive jurisdiction under § 1251(a). Id. at 98. In so concluding, the Supreme Court remarked that "while, under appropriate pleadings, Wisconsin could be joined as a defendant in the present controversy, it is not mandatory that it be made one." Id. at 97. The majority gleans from that statement the proposition that a plaintiff-State does not have to name a State as a defendant where the plaintiff-State has sued the State's officials. The more logical import of that statement, however, is that a plaintiff-State need not name a State as a defendant where the plaintiff-State has named entities from which it may obtain relief and whose actions are not attributable to the State. Id. at 95 (discussing New York v. New Jersey, 256 U.S. 296 (1921), and identifying key issue as "whether the actions of the sewage agency could be attributed to New Jersey so as to make that State responsible for them").
 
 
 57
 The majority thus inappropriately divines from the language of those two cases the proposition that a plaintiff-State may plead around the jurisdictional confines of § 1251(a) by naming State officials as defendants instead of the State itself. The majority's reading is also contrary to the rule that courts must look beyond the pleadings to determine who is the real party in interest, because a State official acting in his or her official capacity functions as an arm of the State.
 
 
 58
 B. The "Core Sovereign Interests" Requirement
 
 
 59
 After presuming that a plaintiff-State has "considerable freedom" to name only State officials in a dispute with another State, the majority places a limitation on that freedom that is directly contrary to the "all controversies" provision of § 1251(a). The majority's limitation consists of a "core sovereign interests" qualifier for determining whether controversies between States are actually "controversies" for the purpose of § 1251(a). That qualifier imposes a restriction on the scope of the statute that is not even remotely suggested by the language of §1251(a), its legislative history, or the case law interpreting the statute.
 
 
 60
 Moreover, as a threshold requirement for determining whether a dispute between States should be brought in the Supreme Court, the core sovereign interests test essentially substitutes a lower court's judgment for the Supreme Court's regarding what is an appropriate controversy for the Supreme Court to hear. The Supreme Court's rules require that a complaining State must petition the Supreme Court for leave to file a Complaint and invoke the Supreme Court's jurisdiction. See Sup.Ct. R. 17(3). The Supreme Court then has "substantial discretion to make case-by-case judgments as to the practical necessity of an original forum in [the Supreme] Court." Mississippi v. Louisiana, 506 U.S. at 76 (citations omitted). The majority's approach to § 1251(a) jurisdiction takes away the Supreme Court's ability to exercise that discretion.
 
 
 61
 The majority justifies this usurpation of the Supreme Court's role in determining which State controversies it will hear by relying on individual justice's remarks that the Supreme Court should exercise its jurisdiction only for State controversies implicating certain types of sovereign interests. See ante at 99-100 (quoting Alfred L. Snapp & Son, Inc. v. Puerto Rico, 458 U.S. 592, 611 (1982) (Brennan, J., concurring); Maryland v. Louisiana, 451 U.S. 725, 766 (1981) (Rehnquist, J., dissenting)). But even in the cases from which those suggestions come, as well as other cases in which the Supreme Court has stated that it will exercise its jurisdiction "sparingly" and "only in appropriate cases," the Supreme Court has never retreated from the view that "28 U.S.C. § 1251(a) . . . provid[es] us [the Supreme Court] 'with substantial discretion to make case-by-case judgments as to the practical necessity of an original forum in this Court.'" Mississippi v. Louisiana, 506 U.S. at 76 (citations omitted and emphasis added). Nowhere does the Supreme Court surrender its prerogative to decide whether it will exercise its exclusive jurisdiction under § 1251(a) to hear a case.
 
 
 62
 Thus, even though permitting a lower court to decide whether a State controversy implicates core sovereign interests may save the Supreme Court the trouble of having to make that determination for itself, there is no legal basis for creating such an efficiency device. Moreover, the implementation of such an approach to jurisdiction over controversies between States would, in essence, substitute the discretion of lower federal courts (or worse, that of a plaintiff-State framing its complaint) for that of the Supreme Court in deciding whether a case is important enough for the Supreme Court to hear. The lower federal courts may not exercise the Supreme Court's discretion on its behalf. The majority's approach clearly violates the exclusivity mandated by Congress.
 
 
 63
 Furthermore, vesting the Supreme Court's discretion elsewhere via a core sovereign interests requirement could result in decisions about the importance of controversies between the States that the Supreme Court might not have made. In this case, for example, the majority concludes that Connecticut's Commerce Clause challenge to a New York lobstering law that allegedly discriminates against the citizens of Connecticut does not implicate core sovereign interests of Connecticut or New York. See ante at 103-04. This Commerce Clause challenge, however, seems no different from other situations in which the Supreme Court exercised its discretion to hear States' Commerce Clause challenges to allegedly discrimininatory laws of other States. See Wyoming v. Oklahoma, 502 U.S. 437 (1992) (coal regulations for power plants); Maryland v. Louisiana, 451 U.S. at 725 (taxes imposed on natural gas imports); Pennsylvania v. West Virginia, 262 U.S. at 553 (regulations preferring in-state residents for natural gas supplies). It thus seems unwise to substitute our judgment as to the "seriousness" and "dignity" of this claim for that of the Supreme Court. See ante at 99-100 (quoting Mississippi v. Louisiana, 506 U.S. at 77).
 
 
 64
 Finally, the majority justifies its core sovereign interests limitation by noting that it will ensure "that some judicial forum be available" for supposedly less important controversies that the Supreme Court might opt not to hear.[1] Ante at 102. This justification, however, simply underscores the fact that the majority's approach to § 1251(a) treads on the Supreme Court's prerogative to decide whether a controversy will be heard at all. The Supreme Court has declined to adjudicate controversies between States where it has determined that the dispute would be adequately addressed in another forum. See Mississippi v. Louisiana, 506 U.S. at 77 (declaring that "we [the Supreme Court] explore the availability of an alternative forum in which the issue tendered can be resolved" when determining whether the Court should exercise discretion to hear case); see, e.g., Arizona v. New Mexico, 425 U.S. at 797 (declining to exercise jurisdiction over action brought by Arizona against New Mexico, where pending State court action brought by citizens of Arizona would address issues presented); Arkansas v. Texas, 346 U.S. at 371 (continuing motion to file complaint until it could be determined whether pending state court action involving other parties but same issues would "resolve[] the whole controversy"). The Supreme Court has even declined to hear a case where no other forum for the dispute existed. See, e.g., California v. West Virginia, 454 U.S. 1027 (1981) (leaving breach of contract action between California and West Virginia unresolved by refusing to exercise exclusive jurisdiction). The teaching of these cases is that the Supreme Court will assess the relevant factors in determining whether it should address a controversy between two States, and it should be allowed to do so.
 
 
 65
 In sum, the majority's use of a core sovereign interests test to separate those cases worthy of being heard by the Supreme Court from those cases that are not is unsupported by precedent. The use of such a test may be more efficient, but it is contrary to the "all controversies" mandate of §1251(a) and encroaches upon the exclusive province of the Supreme Court to decide which interstate disputes it shall hear.
 
 C. Application of Ex Parte Young
 
 66
 Having devised a mechanism by which a State may sue another State's officials in the lower federal courts, the majority rationalizes its creation with the sweeping generalization that "[s]uits to enjoin the unlawful actions of government officials have a rich history in the Anglo-American tradition." Ante at 100-01. The majority puts quite a gloss upon what that "rich history" of suits actually represents.
 
 
 67
 The ability to sue a State official for carrying out his or her official duties is limited to a narrow exception created by the Supreme Court in Ex Parte Young to avoid the general rule that such a suit is deemed a suit against the State that is barred by the State's sovereign immunity. See Pennhurst, 465 U.S. at 101 & n.11. Young provides a legal "fiction" that permits a federal court to treat unconstitutional official acts of a State officer as being separate from the State so that a suit to enjoin the officer from committing such acts would not be barred by the State's sovereign immunity. See id. at 114 n.25; Young, 209 U.S. at 155-56. The "rich history" of suits upon which the majority relies is therefore peculiar to the special context in which Young arose-escaping the bar of sovereign immunity to provide the plaintiff with a forum to bring his or her case.[2]
 
 
 68
 Here, New York could not invoke sovereign immunity to protect against a suit by Connecticut. As the majority correctly notes, "a State does not enjoy sovereign immunity from suit by another State in federal court," and thus "the principles of Young are not directly applicable here." Ante at 101. The principal justification for application of the Young doctrine is completely missing when a plaintiff-State has a dispute with another State, i.e., providing a forum to address a constitutional wrong where none would otherwise exist. The Supreme Court has indicated that Young's fiction should not be invoked where a forum to provide relief is available. See Seminole Tribe of Florida v. Florida, 517 U.S. 44, 74 (1996) (declining to permit suit under Young because a congressional remedial scheme for the dispute at issue existed); see also Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 274 (1997) ("In this case, there is neither warrant nor necessity to adopt the Young device to provide an adequate judicial forum for resolving the dispute between the [plaintiff] and the State [of Idaho]. Idaho's courts are open to hear the case, and the State neither has nor claims immunity from their process or their binding judgment."). With respect to the instant dispute, Connecticut has direct, exclusive access to the highest court in the nation. Thus, to the extent Young is at all relevant here, it counsels that we should not expand federal jurisdiction where a forum for relief already exists.
 
 
 69
 Finally, I note that in contrast to the majority's broadening of the Young doctrine, "the theory of Young has not been provided an expansive interpretation" since it was first created. Pennhurst, 465 U.S. at 102. In fact, the Supreme Court has continually limited the doctrine. See, e.g., Edelman v. Jordan, 415 U.S. 651 (1974) (holding that Young only permits suits against State officials for prospective relief and not retrospective relief); Pennhurst, 465 U.S. at 106 (holding that Young may not be invoked to permit suits against State officials for violations of State law). In recent years, the Supreme Court has continued to view Young as a narrowly tailored doctrine crafted only for the specific context in which it arose. See Papasan v. Allain, 478 U.S. 265, 277 (1986) ("Young's applicability has been tailored to conform as precisely as possible to those specific situations in which it is necessary to permit the federal courts to vindicate federal rights. . . .") (citation and internal quotation marks omitted); see also Seminole Tribe, 517 U.S. at 74 (holding that, where the case presented is "sufficiently different from that giving rise to the traditional Ex Parte Young action," it shall "preclude the availability of that doctrine").
 
 
 70
 Thus, the very cases that have outlined the contours of Young's fiction advise that it is unwise for the majority to expand Young beyond the context in which it was created and permit suits against State officials in order to circumvent the statutory limitations of § 1251(a). The words of the Supreme Court in Coeur d'Alene are instructive:
 
 
 71
 To interpret Young to permit a federal court-action to proceed in every case where prospective declaratory and injunctive relief is sought against an officer, named in his individual capacity, would be to adhere to an empty formalism and to undermine the principle . . . that Eleventh Amendment immunity represents a real limitation on a federal court's federal-question jurisdiction. The real interests served by the Eleventh Amendment are not to be sacrificed to elementary mechanics of captions and pleading. Application of the Young exception must reflect a proper understanding of its role in our federal system and respect to state courts instead of a reflexive resort to an obvious fiction.
 
 
 72
 Coeur d'Alene, 521 U.S. at 270. The jurisdictional limitations of § 1251(a) deserve no less respect.
 
 CONCLUSION
 
 73
 For the foregoing reasons, I believe that § 1251(a) bars this suit and that we should therefore affirm the judgment of the district court dismissing this action for lack of jurisdiction. The majority's approach to §1251(a) is contrary to the statute's plain meaning, and I cannot square the majority's novel reading of §1251(a) with existing precedent. Accordingly, I respectfully dissent.
 
 
 
 Notes:
 
 
 [1]
 That concern is even less relevant in this case because the constitutionality of New York's lobstering law may eventually be resolved in the pending action brought by an individual lobsterman in the U.S. District Court for the Northern District of New York, entitled Volovar v. Cahill, No. 99 CV 718 (FJS)(DRH).
 
 
 [2]
 For this reason, we also reject the majority's contention that Young's fiction merits "broader application" into cases brought by plaintiff-States simply because a fiction analogous to Young has sometimes been employed to avoid the federal government's sovereign immunity. Ante at 101. In the cases cited by the majority, see ante at 101, the federal government's sovereign immunity would have barred suit if the court had not employed a Young-type fiction to deem the federal officer's official acts as separate from actions of the federal government. Cf. Hawaii v. Gordon, 373 U.S. 57, 58 (1963) (per curiam) (holding that suit against a federal official to compel official action was a suit against the United States that could not go forward without the federal government's consent). Thus, even at its very broadest, the fiction embodied in Young only permits courts to treat official acts of a government officer-whether State or federal-as distinct from acts of the government if sovereign immunity presents an obstacle to the suit.